IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

ROSINDA MATUTE-CASTELLANOS,       )
                                  )
        Plaintiff,                )
                                  )
v.                                )    CIVIL ACTION FILE NO.
                                  )    15-A-55279-E4
GEICO INDEMNITY COMPANY, JOHN     )
DOE 1, AND JOHN DO 2,             )
                                  )
        Defendants.               )



* * *

Deposition of
ROSINDA MATUTE-CASTELLANOS

December 3, 2015
10:15 a.m.

242 South Culver Street, Suite 200
Lawrenceville, Georgia

By Marcia Arberman, RPR, CCR B-1059

*********************************************************

U.S. LEGAL SUPPORT, INC.
1819 Peachtree Road, N.E., Suite 220
Atlanta, Georgia  30309
(404) 381-1465
www.uslegalsupport.com

2

E X A M I N A T I O N

                                                    Page

Examination by Mr. Friedman                           5
Examination by Mr. Ghosheh                           83
Examination by Mr. Friedman                          87

E X H I B I T S

Defendant's
Exhibit      Description                             Page

  1          Complaint                                75

APPEARANCES OF COUNSEL:

On behalf of the Plaintiff:

TALAL BAHA GHOSHEH, ESQ.
Ghosheh Law Firm, LLC
242 South Culver Street, Suite 200
Lawrenceville, GA 30046
Phone:      (678) 359-4225
talal@ghoshehlaw.com

On behalf of the Defendant GEICO Indemnity
Company:

ROBERT N. FRIEDMAN, ESQ.
Cruser & Mitchell, LLP
Meridian II, Suite 2000
275 Scientific Drive
Norcross, GA 30092
Phone:      (678) 684-2157
rfriedman@cmlawfirm.com

Also Present:

Patricia Chavez-Dietz, Interpreter

4

MR. FRIEDMAN:  This will be the deposition of Rosinda Matute-Castellanos, taken by agreement of counsel and pursuant to proper notice, taken for all uses under the Civil Practice Act, including discovery and cross-examination and any other purpose allowed under the Act.  All objections will be reserved except those that go to the form of the question and responsiveness of the answer.

Have you discussed signature with your client?

MR. GHOSHEH:  We'll waive signature.

MR. FRIEDMAN:  Okay.  I'm going to ask that you interpret this part, please.

THE INTERPRETER:  Uh-huh (affirmative).

MR. FRIEDMAN:  My name is Robert Friedman.

THE REPORTER:  I need to swear in the interpreter and then swear in the witness.

MR. FRIEDMAN:  Yes, that's right.  Swear in the interpreter and the witness, please.

(Patricia Chavez-Dietz was sworn by the court reporter to interpret Spanish into English and English into Spanish.)

ROSINDA MATUTE-CASTELLANOS,
having been first duly sworn, was deposed and
testified as follows:

EXAMINATION

BY MR. FRIEDMAN:

Q      My name is Robert Friedman.  I'm going to
ask you some questions today.  If at any time you
don't understand the question, please ask me to repeat
or to rephrase it.  If at any time you need to take a
break, please let me know and we can take a
few minutes.

A      Okay.

Q      You understand that you are under oath and
that you have to tell the truth as if you were in
front of a judge and a jury?

A      Yes.

Q      Are you currently taking any medications?

A      No.

Q      Have you ever given a deposition before?

A      No.

Q      Have you been in a prior lawsuit?

A      No.

Q      This is your first lawsuit?

A      Yes.

THE WITNESS:  Do I include everything

6

that I did in the past or not?

MR. GHOSHEH: You've got to answer the question that he asks, so whatever the answer is to that.

A    Of the same case I have done a previous lawsuit because of the same car when I had the accident.

MR. GHOSHEH: We can off the record for a second.

(Off the record.)

BY MR. FRIEDMAN:

Q    Aside from the March 8th, 2012, car accident, have you been involved in any other lawsuits?

A    No.

Q    Have you ever been arrested before?

A    Never.  No.

Q    Have you ever been arrested?

A    No.  I was arrested that time because you place a lawsuit.  It was an arrest order.

Q    You're referring to the March 8th, 2014, arrest?

A    Yes.

Q    Have you ever been arrested other than on March 8th, 2014?

7

A    No.

Q    Have you ever filed for bankruptcy?

A    No.

Q    Have you ever been in the military?

A    No.

Q    Are you a United States citizen?

A    Resident.

Q    Where were you born?

A    Honduras.

Q    Where in Honduras?

A    La Masica.  L-A, one word --

THE INTERPRETER:  I need to clarify the word.  Can I request a spelling of this?

MR. FRIEDMAN:  Yes.

A    Okay.  Honduras, Masica, which is M-A-C-I-C-A [sic].

BY MR. FRIEDMAN:

Q    M-I --

A    No.  M-A --

Q    M-A --

A    -- C-I --

Q    -- C-I --

A    -- C-A.

Q    C-A.

A    Atlantida, which is A-T-L --

8

Q    A-T-L --

A    -- A-N --

Q    -- A-N --

A    -- T-I --

Q    -- T-I --

A    -- D-A.

Q    D-A.   Thank you.

What year were you born?

A    January 3rd, '81 -- 13.

Q    January 13, 1981?

A    Yes.

Q    When did you move to the United States?

A    '99.

Q    How did you get to the United States?

A    Just illegal.  I don't know how to say it.

Q    Like on foot?

A    By bus.

Q    Bus.  And it was not legal?

A    No.

Q    Where did you enter the United States in 1999?

A    Where?  Houston, Texas.

Q    When did you move to Atlanta -- to Georgia?

A    2000.

Q    You said that you were a United States

resident?

A    I'm legal.  It's a U-Visa.  They told me it was a residency.

Q    U-Visa?

A    Yes.

Q    When did you obtain your visa?

A    I have visa for six years.

Q    So 2009 you obtained the visa?

A    I think 2010.

Q    Where did you live in Georgia in 2000 when you first moved here?

A    I don't remember.  I know the apartments' name was Crossing.

Q    What is the highest level of education you have completed?

A    Six.

Q    Was that in Honduras or the United States?

A    Honduras.

Q    Are you married?

A    Yes.

Q    What is the name of your husband?

A    Juan Carlos.

Q    When were you married?

A    We're living together.  We've been married for eight years.

10

Q     So did you get married in 2007?

A     Yes, 2007.

Q     Do you have any children?

A     Yes.

Q     What are your children's names?

A     Carlos Cabellero.

MR. FRIEDMAN:  Will you ask her to spell Cabellero, please?

A     C-A-B-A-L-L-E-R-O.

BY MR. FRIEDMAN:

Q     Thank you.  How old is Carlos?

A     18.

Q     Do you have any other children?

A     Yes.

Q     What are their names?

A     Emily Caballero.

Q     How old is Emily?

A     11.

Q     Anyone else?  Any other children?

A     Yes.  Several more.

Q     Okay.

A     John Caballero.

(In English) Chelsea Caballero.

Q     How old is John?

A     Ten.

11

Q     Chelsea?

A     Eight.  Jeremy.

Q     How old is Jeremy?

A     He's 17 months old.

Q     Where do you currently live?

A     I'm missing Jessica -- Jesiah.

THE INTERPRETER:  Can I request the spelling?

MR. FRIEDMAN:  Yes.

A     Jesiah, J-E-S-I-A-H.

BY MR. FRIEDMAN:

Q     Jesiah, okay.  How old is Jesiah?

A     Six months old.

Q     And what is your current address?

A     3665 Lawrenceville Highway.  I think it's 30348.

Q     30048.  Is that in Lawrenceville?

THE INTERPRETER:  The interpreter is asking -- repeating what you just said.  You said 30048.  And that's as far as I got there.  And she said, I just moved there.  I don't know the complete -- I'm not sure about the address.

MR. FRIEDMAN:  Okay.

BY MR. FRIEDMAN:

12

Q    But it is 3665 Lawrenceville Highway?

A    Yes.

Q    Is it an apartment or a house?

A    Apartment.

Q    Do you rent or own?

A    Rent.

Q    Who lives in the apartment with you?

A    Myself and my children and my husband.

Q    All of your children?

A    Yes.

Q    Anyone else?

A    No.

Q    How long have you lived at 3665 Lawrenceville Highway?

A    A month.

Q    Where did you live prior to 3665 Lawrenceville Highway?

A    5515 Rockbridge --

Q    5515 Rockbridge?

A    -- Circle, Northwest, Lilburn 30347.

Q    How long did you live at 5515 Rockbridge Circle?

A    Two years.

Q    Is that an apartment or a house?

A    House.

13

Q    Did you rent or own?

A    Rent.

Q    Other than your husband and your children, do you have any other family that lives in Georgia?

A    No.

Q    Where do you work?

A    I clean houses.

Q    Do you work for an agency?

A    No.

Q    You are self-employed?

A    Yes.  I have a landscaping company too.

Q    You clean houses and do landscaping?

A    Yes.

Q    How long have you been self-employed cleaning houses and doing landscaping?

A    Five years.

Q    Do you -- do you have a corporation for your landscaping and housecleaning business?

A    Yes.

Q    What's the name of the corporation?

A    Rossy Landscaping.

Q    Can you spell Rossy, please?

A    The way you hear it, R-O-S-S-Y.

Q    Is that an LLC, limited liability corporation?

14

A    I just put the name Rossy Landscaping.

Q    Did you register your corporation with the Secretary of State?

A    Yes.

Q    Prior to cleaning houses and doing landscaping, were you employed doing something different?

A    I was a waitress at a restaurant.

Q    What restaurant?

A    Larivera, L-A-R-I-V-E-R-A.

Q    And where is Larivera?

A    Nayarit.

Q    Oh, I'm sorry.

A    N-A-Y-A-R-I-T.  I don't remember the address.  It's close to Plaza Fiesta.

Q    I like Plaza Fiesta.

Did you review any documents to prepare for your deposition today?

A    No.

Q    I'd like to ask you some questions now about the March 8th, 2012, car accident you were involved in.

A    That's fine.

Q    Where did the accident happen?

A    What is the name of the street?  Do you want

15

the address or what happened?

Q    Well, the location, the intersection.

A    It was in Norcross.  I don't remember the street.

Q    What happened in the accident?

A    When I was turning this way --

Q    What is "this way"?  Left or right?

A    Left.

Q    Okay.  Continue.

A    A car was coming very fast.  And I was with my daughters.  I was with my two girls.  And my light was green.  Somebody came very fast and hit me on the right side of the car.

Q    What direction were they coming from?  If you were turning left, were they going straight?

A    Yes, they're coming straight.

Q    And it hit the right side of your vehicle?

A    Yes.

Q    Did your air bags deploy?

A    No.

Q    Was your car drivable after the accident?

A    A bit.  It barely moved.

Q    How did you leave the scene of the accident?

A    In the car.

Q    Did you drive home from the accident in the

16

same car?

A    Yes.

Q    And would that have been to the 5515 Rockbridge Circle address?

A    No.

Q    Where did you drive home to?

A    I was living at 3207 Henderson Mill Road 30341.

Q    3207 Henderson Mill Road.  What was the rest of that?

A    303 -- 3207.

Q    3207 Henderson Mill Road.  And what was the city?

A    Chamblee Tucker.

Q    And what is the ZIP code, if you remember?

A    30341.

Q    Did the police arrive at the scene of the accident?

A    Yes.

Q    Did they issue any citations?

A    No.

Q    To you or to anyone?

A    I didn't understand the question.

Q    Did the person who hit you get a traffic ticket?

17

A    I think so.

Q    Did you get a traffic ticket?

A    No.

Q    Did the officer speak with you at the scene of the accident?

A    Yes.

Q    Do you remember what the officer told you?

A    He asked me whose fault and what had happened.  And obviously I told him what had happened.

Q    Did he tell you anything?

A    No.  There were two witnesses there.  There were two people.  They saw what happened.  And mainly he talked to them.  He asked them what had happened to them.

Q    Were you hurt in the accident?

A    Yes.

Q    Where were you hurt?

A    My back.  Pain like on this side.

Q    Did you go to the hospital from the accident?

A    No.

Q    Did you go to a doctor after the accident?

A    One of those -- the ones that specialize in giving massages.

Q    Are you referring to a chiropractor?

18

A     Yes.

Q     When did you go to a chiropractor after the accident?

A     Those three days after.

Q     How did you get to the chiropractor?

A     A friend took me.

Q     Did your friend drive your car or her car?

A     His car.

Q     When did you hire Mr. Ghosheh to represent you for the March 8th, 2012, accident?

A     It was around that date because the bills were coming.  It was around that date.

Q     What date?

A     I don't remember very well, but it was during that same week of the accident.

Q     Okay.  How did you know to contact Mr. Ghosheh?

A     Commercials on TV, Internet.

Q     Did you file a claim for the March 8th, 2012, accident with your insurance company?

A     Yes, yes, yes.

Q     Was your car repaired after the accident?

A     No.

Q     What happened to your car after the accident?

19

A      It I did not run properly.  It was making sounds in the lower part.  It didn't run well, good.

Q      Did you take it to a mechanic?

A      No.

Q      Did anyone come to inspect your vehicle from the insurance company?

A      I don't remember.  I don't think so.

Q      Were you paid for the damage to your vehicle?

A      No, no.  They only gave me 1100 because they told me the car was old.  It was a 1988 and did not work.  And it was going to be too costly to pay for the damage.

Q      Who told you that?

A      GEICO, the company.

Q      Did you speak with someone directly at GEICO?

A      They called me from the company, somebody called Jennifer.  And they said it was to going to be more costly to repair the car than the value of the car, so they were going to pay me for the value of the car.

Q      Did Jennifer speak Spanish?

A      No.  English.

Q      Did Jennifer tell you this in English?

20

A    Yes.

Q    Do you understand English?

A    Some.

Q    How did Jennifer know that it would be more costly to repair the vehicle?

A    Through the police report.  And my company talked to the other company.

Q    Your insurance company?

A    Yes.

Q    What was your insurance company?

A    Fuerza Latina, F-U-E-R-Z-A, Latina, L-A-T-I-N-A.

Q    Did Jennifer or anyone else at GEICO tell you to take your car to any repair shop or to have an estimate done?

A    No -- yes, yes.

Q    So after the accident do you remember approximately the day that Jennifer from GEICO called you?

A    No.

Q    Was it within a week of the accident?

A    No.  It was afterwards.

Q    Was it within two weeks of the accident?

A    Yeah.  I think about two weeks.  I don't remember very well.

21

Q    The first time that Jennifer spoke to you about two weeks after the accident, did she tell you to take your car anywhere to have an estimate performed?

A    Yes, to one to see how much they were going to charge.

Q    Where did Jennifer tell you to take your car?

A    To a shop.  I don't remember very well the place, but it's a place they have for them to check the vehicles.

Q    Was it near your apartment?

A    No.  A little bit far.

Q    Do you remember the city that it was located in?

A    Ten minutes.  On Buford, I think.

Q    On Buford Highway?

A    Yes.

Q    Did you take your car to the repair shop that Jennifer asked you to on Buford Highway?

A    Yes.

Q    How did you take your car to the repair shop on Buford Highway?

A    Because I drove it some.

Q    Did you drive the car to the repair shop on

22

Buford Highway?

A    Yes.

Q    The same car that was involved in the accident?

A    Yes.

Q    Was anyone with you in the car when you drove the car to the repair shop?

A    My husband went.

Q    And you think this was about two weeks after the accident that you took your car to the repair shop?

A    I think.  I'm not sure, but I think that's what it was.

Q    Where was your car during the two weeks before you took it to the repair shop and after the accident?

A    There on 32 -- 32 -- the Henderson Mill Road.

Q    At your apartment?

A    Well, yes, yes.

Q    Was the 3207 Henderson Mill Road, was that an apartment complex?

A    Yes.  It's Apartment H-2.

THE INTERPRETER:  And the interpreter --
she said something before, is "I was living

23

there temporary."

A     I don't want to explain that.

BY MR. FRIEDMAN:

Q     How long were you at 3207 Henderson Mill Road?

A     At that time I had just left.  And that time I lived there one year.

Q     What date did you move in and what date did you move out?

A     I don't remember.

Q     Do you remember the year that you moved in?

A     I think it was 2009.

Q     And you moved out in 2010?

A     No.  I think I moved in 2010 and I moved out 2012.

Q     Okay.  Were you living there with your husband and all of your children?

A     Yes.

Q     Were you renting?

A     He was not living there.  I was living just with my children.

Q     And you were renting?

A     Yes.

Q     All right.  So after the accident you drove your car to 3207 Henderson Mill Road; correct?

24

A     Yes.

Q     The car stayed at 3207 Henderson Mill Road for approximately two weeks before you took it to the repair shop; is that correct?

A     Yes.

Q     Okay.  Tell me what happened when you took it to the repair shop on Buford Highway.

A     They would charge 3,000 to repair it -- 3,000 or 2800.  I don't remember.

Q     Did they give you a written estimate?

A     Yes.

Q     Did you speak with anyone at GEICO while you were at the Buford Highway repair shop?

A     No, not at that moment.

Q     Did you speak to anyone other than the person who gave you the estimate, the employees of the repair shop?

A     No.

Q     Okay.  After you got the estimate, did you drive your car home?

A     Yes.

Q     Did you sign anything at the repair shop?

A     No.

Q     When did you next hear from someone at GEICO, Jennifer or anyone else?

25

A    I don't remember.  When I told them how much they were charging, they said they were going to pay for the car.

Q    Did you call GEICO after you got the estimate from the repair shop?

A    Yes.

Q    When did you call GEICO after you got the estimate?

A    That day, I think.  That day.

Q    Did you speak to Jennifer or somebody else?

A    I don't remember.  I know it was a different person, but I don't remember the name.

Q    What did you tell this person?

A    They asked me about what had happened.  And I told them how much they were charging.

Q    And what did the person at GEICO tell you?

A    That I should call Jenny or Jennifer was going to call me back.

Q    When did Jennifer call you back?

A    Right away.  The following day, I think.

Q    What did Jennifer tell you?

A    They were going to pay me off for the car, that I should come and get the check.  The value of the car was 1100.

Q    Where did Jennifer tell you to get the

26

check?

A    I don't remember the address, but it's around Buford Highway.

Q    Was it the same repair shop?

A    At the side.  It's like a little office.

Q    An office at the repair shop?

A    Yes.

Q    Did Jennifer tell you you had to do anything to get this check?

A    Yes.  To sign it off and give it back to her.

Q    Sign what off?

A    The title.

Q    Jennifer told you to travel back to the repair shop to pick up a check and to sign over the title of your car to GEICO to pick up the check; is that correct?

A    Yes.

Q    When did you travel to pick up the check?

A    It was March.  I don't remember the date, but I know it was March.

Q    Was it one week after you went -- was it within the same week that you had the car taken to the repair for an estimate?

A    It was around the same days.

27

Q      Same days, okay.

Did you drive your car back to the repair shop to pick up the check?

A      Yes.

Q      Was anyone with you when you went to pick up the check?

A      My husband.

Q      Did you sign over title to your vehicle to GEICO that day when you picked up the check?

A      Yes.

Q      What did the person at the repair shop tell you about your car?

A      Nothing.  They just told me how much they were charging, and I didn't go back there.

Q      But you went back there to pick up the check?

A      Yes.  Yeah, but the lady where I went to get the check told me that I should leave my car parked outside my apartment, 3207 Henderson Mill Road, and they were going to come and get the car.  After 10:00 a.m. they were going to come and pick it up.

Q      This was a woman that was in the office next to the repair shop?

A      No.  They said she was in sales and finances.  That's the person that pay me.

28

Q    Do you remember her name?

A    Jennifer.

Q    Was it the same Jennifer that you had been speaking with over the phone?

A    Yes.

Q    Did you drive your vehicle home to the Henderson Mill Road address after picking up the check?

A    Yes.

Q    Did anyone come to pick up your car the next day?

A    No.

Q    Did anyone from GEICO contact you?

A    I don't know.  Nobody called me.  I was working at the restaurant, and I never received a call.

Q    Did anyone from Mr. Ghosheh's office call you after you received the check and signed over the title?

A    When that happened, I don't know.  Can I explain what happened?

Q    I want to go through it slowly.  How many days -- did you see your car the next morning after you picked up the check?

A    I left the car there the following morning

29

because they told me they were going to come and pick it up at 10:00 a.m. And they did not come and pick it up the next morning at 10:00 a.m. Several days went by and they didn't come to pick it up, so I thought they were not even interested about it because it was an old car.

Q    Did you drive the car at all the day that you left it there to be picked up?

A    I left the vehicle there where we agree with Jennifer that it was going to be left. And I left it there for several days.

Q    Did you ever move it from that location during those several days?

A    It was there for April, March. In March they came, put a sticker because I took the license plate off.

Q    When you picked up the check, you brought your car back to the apartment complex, like Jennifer told you to, and left it there?

A    (By the witness in Spanish)  Si.

Q    How many days did you leave the car there?

A    It was always there.

Q    After you picked up the check, did you continue to go to work?

A    Yes.

30

Q    How did you get to work?

A    By car.  And after that, with the money that I got, I bought a Ford Focus, and I continued paying for it.

Q    I want to talk only about the week after you got the check.

A    The car was always there, 3207 Henderson Mill Road, Apartment H-2.

Q    The next day when you left your car there at 10:00 a.m., did you go to work?

A    Yes.  But I left the car there because they say they were going to come and pick it up.

Q    How did you get to work?

A    By cab.

Q    How did you pay for the cab?

A    With money, cash.

Q    Cash or credit?

A    No, cash.

Q    On that day after you picked up the check, did you move your car from the Henderson Mill Road address at all?

A    Not that week.  The car was there all the time.

Q    On that day, the day after you got the check, did anyone from GEICO contact you?

31

A    No.

Q    On the day after you picked up your check, did anyone from your attorney's office contact you?

A    No, because the question of the check, it was an agreement between them and I.  So I told my attorney.  My attorney said that it was something that I have to deal with them and I.

Q    What about the following day?

A    The car continued being there, and they did not come.

Q    Did you see the car the following day, two days after you picked up the check?

A    It was there, continued being there.

Q    Did you go to work two days after picking up the check?

A    Yes.  I had to work.

Q    How did you get to work the second day after you picked up the check?

A    The same way.  By cab.

Q    Did you pay with cash for the cab the second day?

A    Yes.

Q    Did you see your car the second day after you picked up the check after you came home from work?

A    It continued there.

32

Q    Did you receive any calls from GEICO the second day after you picked up the check?

A    No.

Q    Any calls from anyone about the car?

A    No.

Q    Okay.  The third day after you picked up the check, was your car still there in the morning?

A    Yes.  The car was always there for them to come and pick it up.

Q    Did you go to work the third day after you picked up the check?

A    Yes.  The same.

Q    Again by taxi?  Again in cash to the taxi?

A    Yes.

Q    What was the name of the taxi company?

A    Los Tigres, L-O-S, Tigres, T-I-G-R-E-S.

Q    Okay.  Los Tigres.

Did you use the same Los Tigres company to take a taxi back from your work to home?

A    Yes.

Q    How many days did this happen that you got up in the morning, saw the car, took a taxi to work, took a taxi home?

A    It was like a month.

Q    30 days?

33

A    Yes.

Q    30 days each day you got up in the morning, saw your vehicle, took a taxi with Los Tigres to work and took a taxi with Los Tigres to home and saw your vehicle when you got home?

A    Yes.

Q    During those 30 days, did anyone call you about your car?

A    I remember they called me once. I told them the car was parked there. And they told me they were going to come and pick it up.

Q    Who called you?

A    GEICO people.

Q    Was it Jennifer?

A    Jennifer.

Q    How many days after you picked up the check did Jennifer call you about the car?

A    They didn't call me much. I don't think they care much about it.

Q    But they called you -- they did call you after you picked up the check during those 30 days? I need to know how many days in. Was it ten days? Was it five days after you picked up the check?

A    That they called?

Q    Yes.

34

A     Five days, I think.

Q     Five days after you picked up the check. What did Jennifer tell you five days after you picked up the check?

A     They were going to come and get the car right there.  They were going to come and get the car at the 3207.

Q     Did Jennifer tell you that they could not find the car at 3207 Henderson Mill Road?

A     No.  She didn't say anything.

Q     Did you tell Jennifer that no one was picking up your car?

A     Yes.

Q     What did Jennifer tell you?

A     She was going to send the person to come and pick it up.

Q     Did anyone else call you about your car during those 30 days that it was parked at the Henderson Mill Road address?

A     No.

Q     Did anyone call you from GEICO and tell you during those 30 days that they could not find the car at that address?

A     No.

Q     Did anyone from your attorney's office call

35

you and tell you that GEICO could not find the car during those 30 days?

A    No.  No.

Q    Do you understand that you're under oath right now?

A    Yes.

Q    Do you know what perjury is?

A    Yes.

Q    And is your testimony that your vehicle stayed at the Henderson Mill Road address after you picked up the check from GEICO for 30 days?

A    Yes.

Q    And it is your testimony that no one from your attorney's office contacted you about your car during those 30 days while the car was at the Henderson Mill Road address?

A    I was expecting for them to come pick up -- to come and pick the car up.  And he said that this is something that I have to deal directly with you.

Q    But no one called you from Mr. Ghosheh's office during those 30 days and told you that GEICO could not find the car?

A    No.

Q    Do you know who Mayra Rubio is?

A    Maria or Mario?

Q    M-A-Y-R-A.  Who is Mayra?

A    That's the person that was dealing with the case.  I would call and she would answer for the case.

Q    Did Mayra call you during those 30 days and ask you any questions about your car?

A    No.

Q    And you took a taxi for 30 days?

MR. GHOSHEH:  I object.  She's already been asked and answered that question several times.

MR. FRIEDMAN:  I understand.  I just need to be clear about this.

MR. GHOSHEH:  She said 30 days that she took a taxi every day, she paid cash.  She gave you the name of the taxi company.  It's been asked and answered.  I will object on that.

BY MR. FRIEDMAN:

Q    How much money did you spend on taxis during those 30 days?

A    $15 a day.

Q    Was that each way or $15 there and back?

A    $15 roundtrip.

Q    That's a good deal.

A    Yes.  When you hire them like that, they

37

charge cheap.

Q     When did you buy a new car?

A     Two months later I bought it.

Q     So this would have been in May, May of 2012?

A     Yes.

Q     Where was your vehicle between March and May of 2012?

A     The one that I bought or the old one that was --

Q     The old one.  The one that was involved in the accident.

A     May?  Where was it?  Can you repeat?

Q     Between March and May -- so two months -- where was your car?  Was it always at the Henderson Mill address for these 60 days?

A     It was missing.  Your detective was looking for it because they couldn't find it.

Q     Did you ever move it from the Henderson Mill Road address between March and May of 2012?

A     May 3rd they placed a sticker on it.  I called GEICO, they should come pick it up at 3207 Henderson Mill Road, Apartment H-2.  And they said the same, Okay, I'm going to send somebody to pick it up.

Q     Prior to May 3rd had you received any warnings about keeping your car at the Henderson Mill

38

Road address?

A    That I should move it.

Q    When did you first receive a warning that you should move your car?

A    May 3rd.

Q    Did you receive any warnings before May 3rd?

A    No.

Q    Was the only warning you received on May 3rd a sticker on your car?

A    Yes.  The ones that didn't have license plates, they were going to be taken away.

Q    What did the sticker say?

A    It said that I have 30 days.  It just said right there that you have to move it.

Q    Did it say why you had to move it?

A    It didn't have license plates.

Q    Why did you take the license plate off your car?

A    I didn't want to leave the plate to them, the license plate to them.  And they were going to come and pick the car up any moment.

Q    When did you take the license plate off the car?

A    Since I parked it there.

Q    In March?

39

A    Yes.

Q    So the day that you got the check, did you take the license plate off the car?

A    And I left it there, yes.  And I left it there the following day.

Q    And you received no warning until May 3rd?

A    Yes.

Q    Did you contact anyone at the apartment complex about the warning?

A    No.

Q    Did you contact your attorney's office and speak to anyone about the warning?

A    No.

Q    Did you tell Mayra about the warning on your car?

A    Yes.

Q    When did you tell Mayra about the warning on your car?

A    Like the following days, around those some days that they put that warning on the car.

Q    What did she tell you?

A    I don't remember.

Q    Did you call anyone at GEICO about the warning on your car?

A    Yes.  I called them.  I called them March

40

the 3rd -- May the 3rd.

Q    Who did you speak to at GEICO?

A    With the same woman.

Q    Jennifer?

A    Yes.

Q    What did you tell Jennifer?

A    That they should come and get the car because they have placed a sticker and they said they were going to take the car away.

Q    Did Jennifer tell you that they could not find the car?

A    No.  They only said they were going to come and pick it up.

Q    After May 3rd, after you got this sticker on your car, did you move your car?

A    There a little bit more than a week.  On the 11th they were picking up all the cars they had put the piece of paper on to take them away.  And then I move it to 3559 Chamblee Tucker 30341, very close to my house and in a little shopping center.

Q    Let's go back for a second.  Who is "they" who is going to pick up cars on May 11?

A    The people at the apartments, the ones in charge of the apartments.  I don't know.

Q    How did you know that they were going to

41

pick up cars on May 11?

A    Because I saw they were picking the cars up.

Q    You saw a tow truck on May 11th?

A    Yes, yes.

Q    How did you know the tow truck was there to take cars away that had stickers and wasn't there to pick up your car?  How do you know that wasn't someone from GEICO?

A    Because you can see, every car they were taking, they all had that sticker.

Q    So on May 11th you observed a tow truck picking up cars that had a sticker on it?

A    Sticker, yes.

Q    What time during the day did you see this happening?

A    I think it was in the morning.

Q    Was this on a workday?

A    No.

Q    Was it a Saturday or a Sunday?

A    With the restaurants you work, you rest in the middle of the week.

Q    So sometime in the middle of the week on May 11th in the morning, you got up and saw a tow truck taking cars with the stickers away from the apartment complex?

42

A     Yes.

Q     Did you speak with anyone in the tow truck?

A     No.

Q     Did you speak with anyone at the apartment complex on May 11th about the cars that were being towed?

A     No.

Q     And it is your testimony that since March when you picked up the check and brought the car back that the car had never been moved from that address until May 11th; is that correct?

A     Yes.

Q     What did you do when you saw a tow truck picking up cars with stickers on it?

A     I took the car to that address, 3559 Chamblee Tucker, a shopping mall.

Q     Why did you move the car?

A     So they wouldn't take it to the tow truck because they said I had to -- they were going to move it, I have to give the car to them.

Q     Was it your car at this point?

A     No.  But they have to come and pick it up.

Q     So you moved the car because you wanted to make sure that GEICO could pick up the car?

A     It had been a long time that I took it to

43

that address.  And at that moment I called Mayra and I told them they need to come pick the car up at that address.

Q     Why did you care if the car was towed?

A     It was under my responsibility still.  I have to give the car to them.

Q     Did Jennifer ever tell you to just take the car somewhere?

A     No.

Q     Did anyone from GEICO ever tell you to drop the car off anywhere?

A     No.

Q     Did Mayra ever tell you that you could drop the car off somewhere?

A     No.

Q     Did you ever ask Jennifer if you could drop the car off somewhere?

A     No, neither.

Q     So you were worried about making sure that GEICO pick up the car, and that's why you moved it on May 11th?

A     Yes.  And that's why we called them for them to come and pick it up to this other address.

Q     If you were worried about the car being picked up, why didn't you just ask Jennifer if you

44

could drop it off somewhere?

A    Because I called them May 3rd to come and pick it up there.

Q    But the car was drivable; correct?

A    It didn't work.  It didn't move a lot.

Q    But you did drive it to the body shop to pick up the check?

A    Yes, but barely.

Q    And you could have driven it back there; correct?

A    Yes.

Q    My question is, Why didn't you ask Jennifer if you could just drive it back?

A    To go drop it off, no.  She said no.  She said she had to send somebody to come and pick it up.

Q    Why on May 11th did you take it to 3559 Chamblee Tucker Road and not to the office where Jennifer had given you the check?

A    Because it's far away.

Q    How far?

A    20 minutes, 15 minutes.

Q    Could you have taken it to Jennifer's office on May 11th?

A    No, because the car wasn't working very much.

45

Q    Explain to me how the car was not working very much.

A    The brakes weren't working.

Q    Were the brakes working when you went to go pick up the check?

A    They didn't work that much.  We almost got into a car accident when we went to get the check because the brakes weren't working properly.

Q    Did you ever tell Jennifer or anyone else at GEICO that the brakes were not working well on your car?

A    No.

Q    Did you tell Mayra or anyone else or your attorney that the car wasn't working very well?

A    Yes.  They knew because that's why they pay off the car, because the car wasn't working.

Q    But I'm asking if you ever told Mayra that I almost got into a car accident when I went to go pick up the check because the brakes are not working?

A    No.

Q    Did you ever tell anybody that the brakes in your vehicle were not working well?

A    No.

MR. FRIEDMAN:  We can take a break.

(Whereupon, a recess was taken.)

46

BY MR. FRIEDMAN:

Q    I want to ask you a question about the apartment complex at Henderson Mill Road where you left the car.  Was the car left in a parking deck, or was it just an open parking spot?

A    General normal parking.

Q    No parking deck?

A    No.

Q    Now, you told me before we took a break that you almost got into a car accident when you went to pick up the check at the office located on Buford Highway.  Tell me about how you almost got into a car accident.

A    There was a car in front of me, and I was in the back.  And I put the brakes.  And I almost hit them, and I had to go sideways.

Q    And it's because the brakes were not working well that you had to go sideways?

A    Yeah.  Otherwise I would hit the car that is in front of me.

Q    Did you tell anyone at the body shop that you almost got into a car accident or that the brakes were not working good?

A    No.

Q    After you almost got into that car accident,

47

you were worried about driving the car?

A    I didn't drive it anymore.

Q    You drove it home after you picked up the check; correct?

A    Yes.

Q    Why?

A    I had to go back.

Q    Why didn't you take a taxi?

A    They said they were going to come and pick it up at the house.  To tell you the truth, I wasn't even putting attention to that.

Q    But you just almost got into a car accident. You said you were concerned.

A    Yes, but I had to return to the house. After that I didn't use it anymore.

Q    So you weren't worried about driving the car back to your house after you picked up the check?

A    Yes.  But I had to go.

Q    And you didn't tell anybody at the body shop or Jennifer when you picked up the check that you were worried about driving the car?

A    No, because supposedly they were going to pick it up the following day.

Q    Did Jennifer when you picked up the check tell you that you could leave the car there?

48

A     No.

Q     Okay.

A     They told me they're going to pick it up at my house.

Q     So when you picked up the check, you were not worried to drive the car home, but on May 11th when you saw cars being towed with a sticker, you were too worried to drive the car to Jennifer's office?

THE INTERPRETER:  Can you please repeat the question?

BY MR. FRIEDMAN:

Q     On May 11th you were too worried to drive the car to Jennifer's office because of the brakes?

A     On May 11 I didn't drive it to Jennifer.  I left it in the parking lot at 3559.

Q     But I'm asking you why you did not take it to Jennifer's office on May 11th.  And before we took a break, you told me because it was too far and you were worried about the brakes.

A     That's the same question.

MR. GHOSHEH:  It's been asked and answered.

BY MR. FRIEDMAN:

Q     I just want to confirm that that is, in

49

fact, the case because it seems like your testimony is changing.

A     No.  It's the same.

Q     Okay.  On May 11th were you worried to drive the car to Jennifer's office?

A     I was worried they were going to take the car away.  That's why I called them on May 3rd.

Q     I want to know why you did not drive the car on May 11th to Jennifer's office on Buford Highway.

A     That's what I said before.  The car wasn't working well and it was a little bit far to go there, so I left it a minute away from my house.

Q     Okay.  What is at 3559 Chamblee Tucker Road?  Is it a shopping center?

A     Yes, shopping.

Q     What's in the shopping center?

A     At that particular time, it was an insurance company.  But at this moment everything is closed there.  There is no company.

Q     Was there anything else?  Was there a supermarket there?

A     A Kroger.  A place like for appointments with doctors.

Q     Did you get permission from anyone at the shopping center to leave your car there?

50

A    No.  At the same moment, I called Mayra to me and get the car the same day.

Q    You asked Mayra to pick up the car?

A    That she should call the GEICO company for them to come and pick it up.

Q    What did Mayra tell you?

A    She said that she had called them.  I called her a little bit later.  And she said that she had called them and they said again they were going to come and pick it up that day.

Q    So you called Mayra on May 11th, told her that you moved the car to the Kroger supermarket; correct?

A    Yes.

Q    And Mayra said that she was going to tell GEICO?

A    She did, she did.  And she told me she had done it.  And I'm sure she did it because she told me she had done it already.

Q    So she called you back on May 11th and said, I contacted GEICO?

A    And they said they were going to pick it up that day.

Q    And this is on May 11th?  Mayra told you that GEICO was going to pick up the vehicle on

51

May 11th at the Kroger shopping center?

A    Yes.

Q    Did you speak to anyone in any of the businesses at the shopping center and tell them you were leaving your car there?

A    No.

Q    Did you see any signs in the parking lot about whether or not you were allowed to park there?

A    I didn't notice.

Q    Were you worried about the car being towed from the parking lot?

A    No, because we called them and they said they were going to pick it up, so it was fine.  That was one less problem.

Q    Who was with you when you moved your car to the Kroger shopping center?

A    My father-in-law came to pick me up.

Q    Was anyone in the car with you when you moved it from Henderson Mill Road to the Kroger Company shopping center?

A    No, no.

Q    But you called your father-in-law to pick you up from the Kroger shopping center?

A    Yes.

Q    How close is this Kroger shopping center to

52

your Henderson Mill Road apartment?

A    Three minutes.

Q    What is your father-in-law's name?

A    Juan.

Q    What's his last name?

A    Caballero.

Q    The same name as your husband?

A    Yes.

Q    After May 11th did you ever see your vehicle at the Kroger shopping center ever again?

A    I didn't go there after that moment.

Q    Have you ever seen your car at all after May 11th, 2012, after you left it there?

A    No.

Q    After May 11th, after you left your car at the Kroger shopping center, did you ever hear from GEICO again?

A    They might have told me that they had called her to let her know that they didn't have the vehicle.

Q    When did Mayra tell you this?

A    I don't remember the dates, but I think it was a couple days later.

Q    What did you tell Mayra?

A    I went to check if the car was there.  And it was no longer there.  Then I noticed there was a

53

phone number there. I called that place, and I gave information of the car to them. And they told me they had never had the car with them.

Q How did you get back to the shopping center to check on the car?

A Walking. It was closeby.

Q You could walk? Why did you have your father-in-law pick you up on the day that you dropped off the car?

A Because he was closeby. He told me that, so he helped me.

Q Did you have a new car at the time when the vehicle was dropped off at the Kroger?

A No, because I told you I bought the car two months later.

Q Two months later. What month was that? This is in May. So when did you buy the car?

A Two months later, a month later.

Q Okay. So you walked over to the Kroger shopping center and couldn't find where your car was?

A It was no longer there.

Q What sign did you see?

A It's there in the parking spots.

Q Was does the sign say?

A I don't know what it says. I know that's

54

the number -- I went to ask and called that number, and they will let me know if they have taken the car away.

Q    Could you read the sign?  Was it in English or Spanish?

A    English.

Q    Were you able to read the sign?

A    Yes.  It was only the phone number.  And I called.  I didn't read the sign.

Q    The sign was in English?  You didn't read it?

A    It was in English.

Q    Do you read English?

A    No.

Q    But you saw a phone number?

A    I was told that I could call that phone number.

Q    Who told you you could call that phone number?

A    One of the clients, he told me.

Q    Clients?  What clients?

A    One person that was shopping at the store.

Q    A person shopping at the Kroger store.  What did you ask this person shopping at the Kroger store?

A    That I have left the car parked there and

55

what do I need to do to find out about the car.

Q    And a Kroger customer told you to call that number?

A    Yes, that number.

Q    Did the person that you called speak Spanish?

A    Yes.

Q    Who did you call?

A    It was a person that was there.  It was not a person that I knew.  It was somebody that spoke Spanish.

Q    Did they identify themselves, what business they were with, who they were?

A    What business they were?  They were shopping in Kroger.

Q    Okay.  You saw a sign that was in English. You did not read the sign.  Did you see the sign when you dropped the car off on May 11th?

A    No.  I didn't know.  I have never left a car like that.  I didn't know.

Q    Why did you not see the sign on May 11th?

A    I didn't put attention.  I was just thinking that I have to call them for them to come and pick it up.

Q    But you saw it when you came back a few days

56

later?

A   Yes.

Q   You called the number, and you don't know who you spoke to?

A   They told me -- yes.  They told me it was a place where they take all the cars.

Q   Was it a towing company?

A   Where they take the cars of that area.  I guess I guess there is a place where the cars of that area are taken.

Q   Okay.  So the person that you called tows cars from the Kroger parking lot?  Is that what he told you?

A   No.  It's a normal person.

Q   What did you tell this person?

A   That I -- what I told you already.  I told this person that I have left the car parked there, that I couldn't find it, and he told me call that phone number.

Q   That's the Kroger shopping person that told you to call the number.

A   (Nods head affirmatively.)

Q   I'm asking you, when you called the number, what did they tell you?

A   Yes.  I asked them if that was the place

57

where they take the cars from this address.  They said yes.  So we told them that -- gave them the information about the vehicle, and they said they didn't have it.

Q     What did you do next?

A     I called Mayra again.  I told her what was happening.  And I'm not sure, but I think she called back to let them know that I didn't know where the car was.  And they said they had a detective to look for the car.

Q     Mayra told you GEICO has a detective?

A     To find those cars.

Q     Did anyone from GEICO call you?

A     No.

Q     Did you ever talk to Jennifer about the car after you moved it to the parking lot?

A     No.  Because everything got quiet, I thought they had the vehicle.

Q     So no one -- the detective never called you?

A     Not me.  They called Mayra.

Q     Okay.  When did you next hear from Mayra?

A     Around those days, but I don't remember. But they told me that I -- when I called the wreck company about the car, they told me that I should make a report at the police so they could help me to find

58

the car.

Q      Who told you to file the police report?

A      The people that were there, the ones that told me -- the people that told me that they didn't have the car.

Q      The towing company told you to file a police report?

A      They told me I could do it so they could help me to look for the car.  It was an option.  If I wanted to, I could do it.

Q      Okay.  Did Mayra tell you to file a police report?

A      No.

Q      Did Mayra tell you that GEICO could not find the car at the Kroger shopping center?

A      Yes.

Q      Did Mayra call you again and tell you that they still couldn't find it?

A      Yes, always, or I would call her to find out if they have found it.

Q      Did Mayra warn you that GEICO was going to report this incident to the police?

A      No.  But she told me that the detective was going to look for it.  But some time had passed already.

59

Q    So Mayra never told you that GEICO was going to report you to the police?

A    Not to me.

Q    Did you ever speak to the detective, someone named Mike, from GEICO?

A    No.  He would call Mayra.  He would talk to Mayra.

Q    When did you -- did you file a police report?

A    Yes.

Q    When did you file a police report?

A    The same month.  The 25th.  May 25th.

Q    Why did you wait so long to file a police report?

A    Because the detective was looking for it also.

Q    Why did you file a police report on May 25th?

A    Because they told me that I should look -- do a search myself.  Mayra told me that I should be looking myself, see if I could find it.

Q    But Mayra did not tell you that GEICO was going to report you to the police?

A    She didn't.  She wasn't -- it was not something sure.  The detective told her if we do not

60

find the vehicle, we are going to press charges against her.

Q    So Mayra told you that GEICO was going to press charges against you if they could not find the car?

A    Yes.

Q    When did Mayra tell you this?  Was it before May 25th?

A    I don't remember.

Q    What did you tell the police when you made the police report on May 25th?

A    That the car was there, I couldn't find it, and I want for them to help me to find it.

Q    Did you tell the police that the car belonged to GEICO?

A    No.

Q    Did you tell the police that GEICO had been looking for the car?

A    Neither.  I don't remember.  I don't think so.

Q    Did you tell the police why you moved the car to the parking lot?

A    No.

Q    Do you remember telling the police that you left the car there for weeks?

61

A    No.  I don't remember.

Q    Did you tell the police that you had left the car there on May 11th?

A    I don't remember if I gave a date.  I just told him that I had left the car parked there and couldn't find it.

Q    After you filed the police report, did you get any calls from any police officers?

A    No, never.

Q    Did you ever hear from anyone named Newberry?

A    No.  I don't know who that is.

Q    Did you ever receive any calls from the Chamblee Police Department?

A    No.

Q    Did you ever hear back from the DeKalb Police Department after you filed the police report?

A    No.  Sincerely I didn't because the detective said he was going to look for it, so I didn't.

Q    But you never spoke to the detective?

A    No.

Q    Did Mayra or anyone else ever tell you that GEICO picked up the car?

A    No.  What happened afterwards, we stayed

62

waiting for the detective because he said if anything happened, he was going let us know. So I called Mayra and -- I called Mayra and she said, No, I haven't heard from him, so I guess they found it.

Q    Mayra told you that she guessed that they found it?

A    Yeah, because he never called her back. And I didn't hear anything of him until the day of my arrest.

Q    Were you concerned that GEICO might have pressed charges against you?

A    No, because if the detective did not call me again, it meant that they have found the car.

Q    Why didn't you call Jennifer to see if they had found the car?

A    To tell you the truth, I didn't think it was necessary.

Q    But you had been previously told that if GEICO did not find the car, they were going to press charges against you.

A    Yes. The detective told that to Mayra.

Q    And you still didn't think it was important to check to see with Jennifer if they picked up the car?

A    Yeah, because Mayra was in charge about what

63

was happening.

Q    But Mayra never told you that GEICO picked up the car, did she?

A    No.

Q    So did you hear anything about your car after May of 2012?

A    Till this day I don't know what happened.  I never heard anything.

Q    Tell me about the day that you were arrested on March 8th, 2014.  How did that happen?

A    I was going to drop my son at the school.  I had all my children.  The little one, John, he was having -- he was having shortness of breath because -- I was taking him to emergency with asthma.  And the police came on the back.

Q    On March 8th, 2014, you were dropping which son at school?

A    The oldest one, Carlos.

Q    At which school?

A    Lakeside.

Q    And what time of day was this?

A    About 7:30.

Q    In the morning or in the night?

A    Morning.

Q    Did you drop Carlos off at Lakeside School?

64

A    At Lakeside they put the blue lights.

Q    And all of the rest of your children were also in the car?

A    Yes.  They put the blue lights.  And I told the policeman not to arrest me, and I asked him why. And he told me that I have a warrant against me.

Q    Why were you pulled over at Lakeside?

A    I was going to drop my child, and that's when they put the blue lights.  And my license plate had a warning.

Q    Did they give you a -- so what did the officer tell you when he pulled you over?

A    They told me that I been stopped because I had a warning on my license plate -- a warrant.

Q    A warrant on your license plate?

A    I don't know how it is.  But he checked my license plate and it showed that I have a warrant.

Q    What did he tell you next?

A    That I had a warrant and he had to arrest me.

Q    Do you remember what police department he was with?

A    DeKalb County.

Q    And he arrested you?

A    Yes.  I was breast-feeding my child.  He was

65

one month old.

Q     Who picked up your children?

A     My sister-in-law.

Q     From Lakeside?

A     Yes.

Q     Did she -- what happened to the car you were driving?  Did your sister [sic] take that car or did the cops have that car towed?

A     My sister-in-law, her husband took the car.

Q     So your sister-in-law's husband took the car and the children home?

A     Yes.

Q     And where did they take you?  The officer, where did he take you?

A     To the jail.

Q     Which jail?

A     DeKalb County in Decatur.

Q     Did they tell you why you were being arrested, what the warrant was for?

A     At that moment they told me they didn't know the reason why the warrant was issued, but I did have a warrant.

Q     When did you learn what the warrant was for? How long were you in jail?

A     It was Saturday, Sunday -- Monday they told

66

me and I got out.  And it was Saturday, Sunday and the Monday of the -- the next day because we didn't have the money.

Q    When did they tell you that you could get out of jail?  What day did they say, Here's how much your bond is?

A    The same Saturday they told me.

Q    What did they tell you the same -- the same Saturday you were arrested, March 8th, 2014, what did they tell you?

A    They didn't tell me the reason why I was arrested.  They just told me that my bond was 650.  But I didn't have the money to pay for the bond.

Q    This is on March 8th, 2014?

A    That was the same Saturday that I was arrested.

Q    Okay.  Why was your son going to the school on a Saturday?

A    Because he had missed a day, so he was behind in a class.  So he was going to work on that class.

Q    So they told you that you needed to pay $650 to get out, but they didn't tell you what the warrant was for; is that correct?

A    Yes, correct.

67

Q    Okay.  Did you eventually get the $650 to bond out?

A    Until later.

Q    When did you post the $650 bond?

A    I'm not sure, but it was around Wednesday or Thursday.

Q    Of the following week?

A    Yes, starting the week.

Q    How did you post the bond?

A    A cousin of my husband pay it in cash.

Q    Is it your understanding that if you had $650, they would have let you out on Saturday, March 8th?

A    Yes.

Q    So you were being held because you needed to get the $650 bond?

A    Yes.

     Monday I got to see the judge.  And the judge explained to me that you have placed a warrant against me.

Q    Did the judge say what the warrant was for?

A    Yes.  He read the document.

Q    Do you remember anything that he told you?

A    That I have received the check and that I had kept the check and the car.

68

Q      The $1,100 check that GEICO gave you?

A      Yes.

Q      And the car that was involved in the accident?

A      Yes.

Q      Do you remember anything that you told the judge?

A      When we were there, the judge said that we should be quiet, that we shouldn't be talking because he was only reading.  He was just going to explain to us the situation.

Q      Did he explain to you how you could get out of jail?

A      No.  He said how much was the bond, but he didn't say when I could leave.

Q      But they also told you how much the bond was on Saturday; correct?

A      Yes.

Q      So aside from reading the warrant, did the judge give you any new information?

A      No.

Q      Did he ask you to enter a plea or to do anything other than just listen to him?

A      Only to listen.

Q      Only to listen.

69

And then on Wednesday or Thursday of the next week, you posted the bond because you got the money from the cousin of your husband, and they let you out?

A    I didn't get out.

Q    When you posted -- you did not get out Wednesday or Thursday when you posted the bond?

A    No, because I have another problem.  It showed there that I have a deportation order even though I have my correct documentation.

Q    When did they tell you about the deportation order?

A    When we paid the bond.  And they told me that I had to wait because Immigration have to come and check for my documentation.

Q    And when did they let you out?

A    Till Monday.

Q    So the following Monday they let you out?

A    Yeah, in the morning.

Q    Okay.  Had you ever been in jail before?

A    No.

Q    Have you ever been detained by an officer for any reason before?

A    No.

Q    After you got out of jail, did you ever

70

review any of the documents that GEICO gave to the police department?

A   No.   They don't let you see that at the police.

Q   Sitting here today, do you know what GEICO told the police department?

A   What the judge said.   They said that I had stolen the car.

Q   The detective Mike with GEICO filled out an incident report and gave that to the Chamblee Police Department.   Have you seen that incident report?

A   No.

Q   Do you know anything that GEICO told the Chamblee Police Department?

A   No.

Q   But you are aware that GEICO did file a report against you with the Chamblee Police Department?

A   I don't know.

Q   But you know that GEICO did report you to the police; correct?

A   Well, the papers talk.   That's what the judge said, that the paper was saying that GEICO said that I had stolen the vehicle.

Q   You filed a complaint against GEICO.   Are

71

you aware of that?

A    Yeah, the one the attorney has.

Q    Have you read that complaint?

A    No.

Q    Do you know what's in the complaint?

A    That I was arrested for your mistake and not mine because you didn't come and get the car where we agreed.

Q    Your complaint stated that GEICO provided false information to the police department.  Tell me every false piece of information that GEICO provided to the police department.

A    I don't have the car.  If I called the date that we parked the car there and they didn't come to get it, sincerely I don't know.  I assumed they took it because it was no longer there.

MR. FRIEDMAN:  I'm going to object to the responsiveness of the answer.

BY MR. FRIEDMAN:

Q    I'm going to ask you again.  What false information did GEICO provide to the police?

A    I don't have the car.

MR. FRIEDMAN:  Again, I'm going to object to the responsiveness of the answer .

MR. GHOSHEH:  I'm going to step in here.

72

She said that GEICO stated she has the car and she doesn't.

MR. FRIEDMAN:  I haven't heard that.

MR. GHOSHEH:  That's what she said.

I'll object to your objection.

BY MR. FRIEDMAN:

Q    Is it your testimony that GEICO reported that you still have the car?

THE INTERPRETER:  Can you please repeat the question?

BY MR. FRIEDMAN:

Q    Are you testifying that GEICO reported to the police department that you still have the car that was involved in the accident?

A    What?

Q    You filed a complaint against GEICO.  That complaint states that GEICO provided false information to the police.  I represent GEICO.  I have to know what false information did GEICO present to the police department.

A    Well, I don't know.  The question would be the same.  They're accusing me of something that I have not done.  If they had to pick the car, why they didn't pick it up [sic]?  And I wouldn't be having problems.  Why you didn't go pick it up?

73

MR. FRIEDMAN:  I'm going to object to the responsiveness of the answer.

BY MR. FRIEDMAN:

Q     What did GEICO report to the Chamblee Police Department?

A     That I had the vehicle.

Q     Have you seen any written documents that state that GEICO told the Chamblee Police Department that you have the vehicle?

A     No, only what the judge said.  I have not seen it.

Q     So sitting here today, you do not know what GEICO reported to the police department?

A     It's not the same thing as the DeKalb?

Q     No.  GEICO's detective Mike filed an incident report with the Chamblee Police Department. Have you seen that incident report?

A     No.

Q     So then you're not aware of any false information that Mike provided to the police in that incident report, are you?

A     No.  The only thing I know, that I went to jail because of your mistake.

MR. FRIEDMAN:  I object to the responsiveness of the answer.

74

BY MR. FRIEDMAN:

Q    Are you aware of any false information that Mike, the detective, reported to the Chamblee Police Department?

A    It is not the same thing as the car, that I had the car?

Q    I'm asking you, What did he -- you made an allegation against GEICO.  You're aware of that; correct?

A    Yes.

Q    You need to tell me what false information was provided.

A    No.

MR. GHOSHEH:  Let's stop here for a second and go off the record.  She's answered you --

THE REPORTER:  Did you want to go off the record also?

MR. FRIEDMAN:  No.  I don't want to go off the record.

MR. GHOSHEH:  Can we take a short break then?

MR. FRIEDMAN:  I want to finish this line of questioning.

What was the answer?

75

MR. GHOSHEH:  Do you understand the question?

THE WITNESS:  (In English)  No.

MR. GHOSHEH:  Can you please ask a different question?

BY MR. FRIEDMAN:

Q    Okay.  I'm going to introduce this as an exhibit.  This is going to be Defendant's Exhibit 1.

(Marked for identification, Defendant's Exhibit No. 1.)

BY MR. FRIEDMAN:

Q    This is a copy of the complaint that you filed.  In paragraph 40 of your complaint, on page 6 you have alleged against GEICO, Defendant's staff provided false information and omitted important information to the police in order to have Plaintiff arrested.

Tell me what false information is being referred to in paragraph 40.

A    I think we're talking about the same.  I think you are saying that I do have the vehicle, and I don't have it.

MR. FRIEDMAN:  I object to the responsiveness of the answer.

A    I don't understand that question, so I am

not going to answer it.

BY MR. FRIEDMAN:

    Q    What information did GEICO omit to the police department?

    A    What they did not say to the police?

    Q    What information was withheld by GEICO that they did not tell the police?

    A    The detective never called to say that the vehicle had been found or not had been found, nothing.

        MR. FRIEDMAN:  Object to the responsiveness of the answer.

BY MR. FRIEDMAN:

    Q    Did the detective conceal any information from the police?

    A    Well, he would have said the truth, that the car had not been found.  So he should have said if the car had not been found, so we're going to put a warrant against you.  Wasn't his duty to call Mayra and said we did not found the car [sic], so we're going to put a warrant against her?

        MR. FRIEDMAN:  Object to the responsiveness of the answer.

BY MR. FRIEDMAN:

    Q    Did GEICO's detective lie to the police?

    A    I think so because I'm not guilty of what

77

they're accusing me of.

Q    Tell me the lie that GEICO's detective told the police.

MR. GHOSHEH:  She's already answered that same question.  You keep asking it over and over and over.  She has stated that GEICO believes she has the car, the detectives reported that to the police.  You keep asking the same question.

You're presenting these documents to a woman who has a sixth grade education and does not have legal training.  She does not understand your question.  You can object all you want to the responsiveness.  She's answering it the best she can.

BY MR. FRIEDMAN:

Q    Paragraph 41 of your complaint states, Plaintiff was falsely arrested as a result of the false and inaccurate information provided to the Chamblee police.

A    That's right.

Q    Tell me what false and inaccurate information GEICO provided to the Chamblee police.

A    I don't know what happened because they don't say if the wreck -- the GEICO wreck [sic] came

78

to get there and put a different pin number [sic]. What I do know is the car is not there and it's not with me.

Q    You understand that you have sued GEICO because you are stating in this document that GEICO lied to the police?  Do you know what a lie is?

A    Yes.  And I know what I'm saying is what I know that happened.

Q    Is it your contention that GEICO lied to the police?

A    I think so because I'm not guilty of what I'm being accused of.

Q    All I want to know is what lie did GEICO tell the police.

A    Tell him, are you sure that I have the vehicle?  Because they're saying that I'm lying, so we're talking about this same car.

MR. FRIEDMAN:  Object to the responsiveness of the answer.

BY MR. FRIEDMAN:

Q    Has your child ever lied to you before?

A    All the children sometimes lie to their parents.

Q    Do you understand that a lie is false information?

79

A      Yes.

Q      What did GEICO tell the police that was false or a lie?

A      That I have the vehicle.

Q      Thank you.

Did GEICO withhold any information from the police?

A      They didn't say everything.  They didn't say that the detective went missing and we didn't know anything else about the car.  And then a year-and-a-half later this problem comes up.

Q      It's your contention that GEICO did not tell the police that they were looking for the car?

THE INTERPRETER:  Can you please repeat the question?  The interpreter missed the thought.

BY MR. FRIEDMAN:

Q      Are you stating that you believe that GEICO did not tell the Chamblee Police Department that they were looking for the car?

A      It was easier for them just to place the warrant against me.

MR. FRIEDMAN:  Object to the responsiveness of the answer.

BY MR. FRIEDMAN:

80

Q    You have also alleged that GEICO hired --
was negligent in hiring its staff.  Do you know
what --

MR. FRIEDMAN:  I'm sorry.  Go ahead.

A    I think so.

BY MR. FRIEDMAN:

Q    Do you know what negligence means?

A    They don't do things correctly and due to
their mistake, one pays the price.

Q    Tell me how was GEICO negligent in hiring or
training its staff.

A    They have to put more attention to the
situation.

Q    What did GEICO's staff not pay attention to?

A    For example, to go pick it up the day that
was agreed.  Where all this problem -- all this time
went past and we thought everything was over.  And who
pay for it was me and my children.

Q    Have you ever spoken to anyone at the
Chamblee Police Department since being arrested?

A    Once before they told me in the past that I
had the warning, but they just told me that I had the
warning and they said I could go.  I was not arrested.

Q    When was this?

A    Like a week before, I think.

81

Q    The week before you were arrested?

A    Yes.

Q    What happened on that day?

A    I was just going by.  And the ones that take the license plate with the machine, he told me that I had a warning on my license plate.  And I asked them why.  And they said they couldn't explain to me because they didn't know.

Q    Where were you driving when this happened?

A    I don't remember what happened, but I was taking a man to a job site.

Q    What man?

A    A friend.

Q    Taking a friend.  And an officer pulled you over?

A    Yes.

Q    And he told you you had a warrant for your arrest?

A    On my license plate it showed.

Q    But he did not arrest you?

A    No.

Q    Did you call your attorney and let him know that you had a warrant out for your arrest?

A    No.

Q    Did you call anybody and ask about the

82

warrant?

    A    No.

    Q    Did you tell anyone else about the warrant for your arrest?

    A    No.

    Q    What did the officer tell you to do?

    A    He told me that I have that warning on my license plate.  And he said maybe it was a mistake, that I should go.

    Q    "That I should go?"

    A    (In English)  Go home.

    Q    Why didn't you call someone about this warrant?

    A    No, I didn't do anything.  I didn't put any attention to it.

    Q    After your arrest did you talk to anyone at the Chamblee Police Department?

    A    No.  I didn't know anything till now that you mentioned it's the Chamblee.

    Q    Today is the first day that you're hearing that it was the Chamblee Police Department that swore out the warrant for your arrest?

    A    Yes.

    Q    So you haven't reviewed any documents that GEICO provided to the Chamblee Police Department, have

83

you?

    A    I didn't review it.  I just told him what the judge said.  I didn't review myself.

    Q    And you've never spoken to anyone named Newberry at the Chamblee Police department?

    A    No.

    Q    Has your phone number changed at any time between the accident in 2012 and your arrest in 2014?

    A    Yes.

    Q    When did your phone number change?

    A    I don't remember.

    Q    Was it more than once?

    A    Twice.

    Q    Was your phone number changed in 2012?

    A    I don't remember.

    MR. FRIEDMAN:  All right.  I don't have anything further.

                      EXAMINATION
BY MR. GHOSHEH:

    Q    You stated earlier that you have a -- the highest grade that you completed is sixth grade; correct?

    A    Yes.

    Q    And you've also stated earlier that English is not your primary language; correct?

84

A    No.

Q    And reading English is something that you cannot do well?

A    No.

Q    And for this lawsuit you hired my firm to assist you with this case; correct?

A    Yes, correct.

Q    And you've discussed the case with me and my staff on several occasions; correct?

A    Yes.

Q    And is it possible that there are certain items that we have discussed that you may not remember in their entirety without reviewing in detail?

A    Yeah.  It's been a while.

Q    And you -- okay.  And you don't have a law degree?

A    Correct.

Q    And you don't have any formal legal training?

A    Never.

Q    Safe to say that a lot of the terminology and concepts of -- you don't understand them fully and completely?

A    Correct.  I don't understand.

Q    Okay.  Just to review, when you were talking

85

about the timeline of how long your vehicle sat in front of your apartment at Henderson Mill, Apartment H-2 --

A    Yes.

Q    -- okay, approximately how much time do you recall that the car sat there from the end of March when you picked up your check until your testimony that you said you moved the car on May 11th?  How much time passed when the car was sitting in front of the house and had not been moved?

A    About six weeks.

Q    Okay.  And in those six weeks, you did not drive the car, you did not move the car, you did not in any way use the car; is that correct?

A    No.

Q    Okay.  And at all times have you been cooperative with GEICO to assist them in picking up the vehicle?

A    I called them May 3rd for them to come and pick it up.

Q    Okay.  Did you at any time attempt to conceal the location of the vehicle?

A    No.  I didn't need it anymore.  Why would I want a car without a title?  And it didn't work.

Q    Okay.

86

A    I'm not like that.

Q    And these incidents that we're talking about took place approximately a little over three years ago; correct?

A    Yes.

Q    Okay.  So is it possible that there may be some items which you do not remember in their entirety?

A    Yeah, because the case is supposed to be over.

Q    In regards to the title, when you received the check -- your earlier testimony was that you received the title.  Well, you turned the title over to GEICO; correct?

A    Right there.  She gave me the check, and I gave her the title.

Q    Okay.  Was it your understanding that GEICO was going to put the title into their name?

A    Yes.

Q    And do you know if they did that?

A    Did I know?  Yes.  Did I know?  Yes, because I signed it out.

MR. GHOSHEH:  All right.  That's all the questions I have.

/ / /

87

EXAMINATION

BY MR. FRIEDMAN:

 Q Just one follow-up question.  On May -- you said you called GEICO on May 3rd?

 A Yes.

 Q Who did you speak to at GEICO on May 3rd?

 A Jennifer.

 Q Why did you call GEICO on May 3rd?

 A Because it had the sticker and they were going to take it away.

 Q You spoke to Jennifer directly on May 3rd?

 A Yes.

  MR. FRIEDMAN:  Okay.  That's it.

  (Deposition concluded at 1:14 p.m.)

88

CERTIFICATE

I hereby certify that the foregoing transcript was reported, as stated in the caption; that the witness was duly sworn and elected to waive signature in this matter; that the colloquies, questions and answers were reduced to typewriting under my direction; and that the foregoing pages 1 through 87 represent a true, correct, and complete record of the evidence given.

The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of U.S. Legal Support, Inc., and the signature and original seal is attached thereto.

Pursuant to Article 10B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:  That I am a Georgia Certified Court Reporter and Registered Professional Reporter, here as an independent contractor for U.S. Legal Support, Inc.; that I was contacted by the offices of U.S. Legal Support, Inc. to provide court reporting services for this deposition; that I will not be taking this deposition under any contract prohibited by Georgia law; and that I am not disqualified as a reporter for a relationship of interest under the provisions of O.C.G.A. 9-11-28(c).

This the 13th day of December, 2015.

_Marca Arberman_
MARCIA ARBERMAN, CCR-B-1059
* * *

(Reporter disclosure made pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia.)

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

ROSINDA MATUTE-CASTELLANOS

          Plaintiff,

v.

GEICO INDEMINITY COMPANY,

INSURANCE AUTO AUCTIONS CORP.,

INSURANCE AUTO AUCTIONS OF

GEORGIA LLC,

JOHN DOE 1,

JOHN DOE 2

          Defendants.

CIVIL ACTION

FILE NO.: __15A55279E4__

### SUMMONS

TO THE ABOVE-NAMED DEFENDANT:

    You are hereby summoned and required to file with the Clerk of said Court and serve upon the Plaintiff's attorney, whose name and address is as follows:

**GHOSHEH LAW FIRM LLC**
**242 South Culver Street**
**Suite 200**
**Lawrenceville, Georgia 30046**
**678-359-4225 (Office) 404-996-1219 (Fax)**

an answer to the complaint which is herewith served upon you, within thirty (30) days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment on the pleadings will be taken against you for the relief demanded in the complaint.

This _____ day of _____, 2015.

          Clerk of State Court of Dekalb County
          By:

          _____

To the Respondent upon whom this Complaint is served, _____:

This copy of Complaint and Summons was served upon you _____, 2015.

_____
Deputy Sheriff, DeKalb County

DEFENDANT'S
EXHIBIT
1
12.3.15 mA
PENGAD 800-831-6989

STATE COURT OF
DEKALB COUNTY, GA.
4/14/2015 2:45:16 PM
E-FILED
BY: Monica Gay

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

ROSINDA MATUTE-CASTELLANOS

Plaintiff,

v.

GEICO INDEMINITY COMPANY,
INSURANCE AUTO AUCTIONS CORP.,
INSURANCE AUTO AUCTIONS OF
GEORGIA LLC,
JOHN DOE 1,
JOHN DOE 2

Defendants.

CIVIL ACTION
FILE NO.: ___15A55279E4_____

JURY TRIAL DEMANDED

## COMPLAINT

COMES NOW ROSINDA MATUTE-CASTELLANOS, Plaintiff, and makes and files this complaint against Defendants, GEICO INDEMINITY COMPANY, INSURANCE AUTO AUCTIONS CORP., INSURANCE AUTO AUCTIONS OF GEORGIA LLC, JOHN DOE 1, and JOHN DOE 2 as follows:

## PARTIES AND JURISDICTION

1. Plaintiff ROSINDA MATUTE-CASTELLANOS resides at 3016 Medinah Court, Chamblee, Georgia, 30341 and is subject to the jurisdiction of this court.

2. GEICO INDEMINITY COMPANY is a foreign corporation existing under the laws of Maryland with its principal place of business in 5260 Western Avenue, Chevy Chase, MD,

STATE COURT OF
DEKALB COUNTY, GA.
4/14/2015 2:45:16 PM
E-FILED
BY: Monica Gay

20815 and may be served through its registered agent CT CORPORATION SYSTEM at 1201 Peachtree Street NE, Atlanta, Georgia, 30361 and is subject to the jurisdiction of this court.

3. INSURANCE AUTO AUCTIONS CORP. is a foreign corporation existing under the laws of Delaware with its principal place of business in Two Westbrook Corporate Center, Suite 500, Westchester, Illinois, 60154 and may be served through its registered agent CORPORATION SERVICE COMPANY at 100 Peachtree Street, Atlanta, Georgia 30303 and is subject to the jurisdiction of this court.

4. INSURANCE AUTO AUCTIONS OF GEORGIA LLC is a domestic corporation existing under the laws of Georgia with its principal place of business in Two Westbrook Corporate Center, Suite 500, Westchester, Illinois, 60154 and may be served through its registered agent CORPORATION SERVICE COMPANY at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092 and is subject to the jurisdiction of this court.

5. John Doe 1, is unknown at this time, but is believed to have conducted business in Dekalb County. Plaintiff reserves the right to amend her complaint at such time that the identity of John Doe 1 becomes known.

6. John Doe 2, is unknown at this time, but is believed to have conducted business in Dekalb County. Plaintiff reserves the right to amend her complaint at such time that the identity of John Doe 2 becomes known.

7. Jurisdiction and venue are proper in this court.

-2-

## BACKGROUND

8. Defendant GEICO INDEMINITY COMPANY owns and operates GEICO Insurance which provides insurance coverage to persons in the State of Georgia, including those residents of Dekalb County, Georgia.

9. Defendant INSURANCE AUTO AUCTIONS CORP works with various insurance carriers in the State of Georgia, to buy and purchase salvage vehicles, including those located in Dekalb County, Georgia including Defendant GEICO INDEMINITY COMPANY.

10. Defendant INSURANCE AUTO AUCTIONS OF GEORGIA LLC works with various insurance carriers in the State of Georgia, to buy and purchase salvage vehicles, including those located in Dekalb County, Georgia including Defendant GEICO INDEMINITY COMPANY.

11. On or around March 8, 2012, Plaintiff was struck by Mr. Elmo Watkins, an insured of the Defendant GEICO INDEMINITY COMPANY.

12. Mr. Elmo Watkins was cited for failure to obey a traffic control device and was found to be at fault.

13. Defendant GEICO INDEMINITY COMPANY, accepted liability on behalf of their insured, Mr. Elmo Watkins and covered the claim under claim number 02425-2670-0101-050.

14. Defendant GEICO INDEMINITY COMPANY issued payment to Plaintiff in the amount of $1108.01 on April 4, 2012 as full payment for the total loss of Plaintiff's vehicle, a 1988 Mercury Tracer, VIN # 3MABM1259JR667971.

15. Defendant GEICO INDEMINITY COMPANY is believed to have contracted with Defendant INSURANCE AUTO AUCTIONS OF GEORGIA LLC and INSURANCE AUTO AUCTIONS CORP to have the salvage vehicle picked up and sold.

-3-

16. Plaintiff left the vehicle, as agreed at her address and cooperated with an unknown agent of Defendants to arrange pickup of the vehicle.

17. Defendants' agent failed to pick up the vehicle in a timely manner and as such Plaintiff was told by her landlord that she must move the totaled vehicle from the residence or it would be towed as salvage vehicles cannot be stored there.

18. Plaintiff moved the vehicle to a public parking lot located at 3559 Chamblee-Tucker Road, Chamblee, Georgia, 30341 and informed the Defendant GEICO INDEMINITY COMPANY, Defendant INSURANCE AUTO AUCTIONS CORP, and Defendant INSURANCE AUTO AUCTIONS OF GEORGIA LLC of the whereabouts of the vehicle at the new address, by and through her Counsel. Counsel was given a reference number of 9673869.

19. An unknown agent of Defendant GEICO INDEMINITY COMPANY, Defendant INSURANCE AUTO AUCTIONS CORP, or Defendant INSURANCE AUTO AUCTIONS OF GEORGIA LLC is believed to have picked up the vehicle from the public parking lot between May 11, 2012 and May 21, 2012.

20. Defendant GEICO INDEMINITY COMPANY assigned a Special Investigator to track down the whereabouts of the vehicle.

21. Plaintiff, through her counsel, worked diligently to find the whereabouts of the vehicle, but was unable to track it down.

22. Counsel for Plaintiff spoke to GEICO INDEMINITY COMPANY's Special Investigator regarding the incident and cooperated in all regards to the investigation.

23. Michael from Defendant's Special Investigations Unit informed Plaintiff's Counsel that he was tracking down the whereabouts of the vehicle.

- 4 -

24. Plaintiff reported the car stolen to the Dekalb County Police Department, Case No. 12-060825.

25. Defendant GEICO INDEMINITY COMPANY ceased communication with Plaintiff's counsel and on or before July 24, 2012 and Defendant GEICO INDEMINITY COMPANY gave sworn statements to the Chamblee Police Department accusing the Plaintiff of Concealment of Property with Security Lien, in violation of O.C.G.A. 16-9-51.

26. An arrest warrant was issued based solely on the information provided by the Defendant GEICO INDEMINITY COMPANY's staff.

27. An arrest warrant was issued on July 24, 2012 for Plaintiff's arrest.

28. Defendant GEICO INDEMINITY COMPANY or Defendant INSURANCE AUTO AUCTIONS CORP., or Defendant INSURANCE AUTO AUCTIONS OF GEORGIA LLC made no subsequent efforts to locate the 1988 Mercury Tracer, VIN # 3MABM1259JR667971.

29. Defendant GEICO INDEMINITY COMPANY or Defendant INSURANCE AUTO AUCTIONS CORP., or Defendant INSURANCE AUTO AUCTIONS OF GEORGIA LLC did not update the status of the vehicles whereabouts to the Chamblee Police Department.

30. As a result, Plaintiff was arrested on March 8, 2014 due to the outstanding warrant from July 24, 2012.

31. Plaintiff nor her counsel had knowledge that the arrest warrant had been taken out, nor that this matter was still pending.

32. Plaintiff was arrested in front of her children and taken to jail.

33. On April 14, 2014, the Dekalb County Solicitor's office, declined to prosecute the case and dismissed the charges against the Plaintiff. As such, the one-year statute of limitations is

tolled until April 14, 2015, and as such Plaintiff has timely filed her complaint for false arrest.

34. Plaintiff did not commit any crime against Defendants or anyone else, but rather was a victim of the carelessness and negligence of the Defendants.

35. Plaintiff at all times cooperated with Defendants by and through her counsel to obtain the whereabouts of the vehicle.

36. Plaintiff believes that the vehicle was picked up by an agent of Defendant GEICO INDEMINITY COMPANY or Defendant INSURANCE AUTO AUCTIONS CORP., or Defendant INSURANCE AUTO AUCTIONS OF GEORGIA LLC and was subsequently sold.

37. Whereabouts of the vehicle in question are still unknown to the Plaintiff.

## COUNT ONE

### FALSE ARREST AND MALICIOUS PROSECUTION

38. Plaintiff alleges and incorporates herein the allegations contained in paragraphs 1 through 37 above as if fully restated.

39. Defendant's staff did not have probable cause to believe that plaintiff committed a crime.

40. Defendants' staff provided false information and omitted important information to the police in order to have Plaintiff arrested.

41. Plaintiff was falsely arrested as a result of the false and inaccurate information provided to the Chamblee Police.

42. Defendants' staff acted with malice and without sufficient probable cause in having Plaintiff arrested.

-6-

43. Defendants' maliciously and without probable cause prosecuted plaintiff for the crime of Concealment of Property with Security Lien, in violation of O.C.G.A. 16-9-51.

44. As a result of plaintiff's false arrest and malicious prosecution, he/she has suffered emotional distress, humiliation, and mental pain and suffering.

## COUNT TWO

## NEGLIGENT HIRING, TRAINING AND SUPERVISION

45. Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 44 above as if fully restated.

46. Defendants were negligent in hiring, training and supervising the staff in the pickup and investigation of the recovery of vehicles and reporting them to the State.

47. Defendants' negligence in hiring, training and supervising the individuals resulted in the arrest of plaintiff.

## COUNT THREE

## VICARIOUS LIABILITY

48. Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 47 above as if fully restated.

49. At the time of the arrest, the individuals working at were employed by defendant and were acting within the scope of their employment at all times relevant to this litigation.

50. Defendants are responsible for the conduct and actions of the individuals working at GEICO INDEMINITY COMPANY, INSURANCE AUTO AUCTIONS CORP. and INSURANCE AUTO AUCTIONS OF GEORGIA LLC pursuant to the doctrine of *respondeat superior,* agency or apparent agency.

-7-

## COUNT FOUR

### PUNITIVE DAMAGES

51. Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 50 above as if fully restated.

52. Defendants' conduct was reckless, willful and wanton, and demonstrates a conscious indifference to the consequences of its actions and entitles plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays that she has a trial on all issues and judgment against Defendants as follows:

a. That Plaintiff recover for past and future physical and mental pain and suffering in an amount to be determined by the enlightened conscience of a jury;

b. That Plaintiff recover punitive damages in an amount to be determined by the enlightened conscience of a jury; and

c. That Plaintiff recover such other and further relief as is just and proper.

This 14th day of April, 2015.

Respectfully submitted,

Talal "Perez" Ghosheh
Attorney for Plaintiff
State Bar No.: 150049

Ghosheh Law Firm LLC
242 South Culver Street
Suite 200
Lawrenceville, Georgia 30046
678.359.4225 (Office)
404.996.1219 (Fax)
talal@ghoshehlaw.com

- 8 -